58 CCPA

**Application of Gary R. BENSON and Arthur C. Tabbot.**

**Patent Appeal No. 8376.**

United States Court of Customs and Patent Appeals.

May 6, 1971.

Robert O. Nimtz, attorney of record, for appellant.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Jere W. Sears, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

RICH, Judge.

This appeal is from the January 31, 1968 decision of the Patent Office Board of Appeals [1] affirming the rejection of claims 8 and 13, the only claims remaining in appellants' application serial No. 315,050, filed October 9, 1963, and assigned to Bell Telephone Laboratories Incorporated, entitled "Conversion of Numerical Information." We reverse.

*The Invention*

The invention of the appealed claims is in the field of computer technology and relates to data processing systems. The claims are both directed to methods. The opening sentence of the specification states that the invention relates to the processing of data by program and more particularly to the programmed conversion of numerical information. The particular conversion to which both of the claims on appeal are directed is the conversion of "binary coded decimal" (BCD) numerical information in the form of "signals" (claim 8) or "representations" (claim 13) into binary number signals or representations, respectively. Though we presume this statement would be an adequate explanation to those skilled in the computer art, for the benefit of those not so skilled we will elucidate further.

Most digital computers perform their computing operations on information in binary form, a system of representation having only two elementary constituents, called "bits," indicated by "1" and "0". Men, on the other hand, are accustomed to quantitative information in decimal form and, for computer to work on or

1. Consisting of Kreek, Keely, and Andrews, Examiners-in-Chief, opinion by Andrews.

utilize it, it must be converted into binary form. It has become a general practice to make this conversion in two stages: from decimal to BCD; from BCD to binary. The following table shows the ten familiar decimal digits and their binary equivalents expressed in groups of four bits:

| decimal | binary | decimal | binary |
|---------|--------|---------|--------|
| 0 | 0000 | 5 | 0101 |
| 1 | 0001 | 6 | 0110 |
| 2 | 0010 | 7 | 0111 |
| 3 | 0011 | 8 | 1000 |
| 4 | 0100 | 9 | 1001 |

In BCD notation the decimal number 53 would be represented as 0101 0011, the binary form of 5 followed by the binary form of 3, each group of four bits being a BCD "digit." Although the BCD notation is in terms of "1" and "0" only and can be represented in a binary machine, it is not in a form in which the machine can utilize it to perform its computing operations. In true binary the decimal number 53 is represented by 110101. The problem is to convert the intermediate BCD representation into the true binary. Various ways of doing this were known prior to appellants' invention. They claim to have discovered a better and simpler way of doing it having various advantages recited in the specification such as reducing the number of steps required to be taken, dispensing with the repetitive storing and retrieval of partially converted information, eliminating the need for interchanging signals among various equipment components and the need for auxiliary equipment, and decreasing the chance of error.

The digital computer which is to receive the information in BCD form can itself be programmed to convert it into binary form. The specification gives as an illustrative example an actual program for converting a binary-coded decimal number to ordinary binary and apparatus is described in conventional block diagram form in which the program can be carried out.

The two claims on appeal read as follows:

8. The method of converting signals from binary coded decimal form into binary which comprises the steps of

(1) storing the binary coded decimal signals in a reentrant shift register,

(2) shifting the signals to the right by at least three places, until there is a binary "1" in the second position of said register,

(3) masking out said binary "1" in said second position of said register,

(4) adding a binary "1" to the first position of said register,

(5) shifting the signals to the left by two positions,

(6) adding a "1" to said first position, and

(7) shifting the signals to the right by at least three positions in preparation for a succeeding binary "1" in the second position of said register.

13. A data processing method for converting binary coded decimal number representations into binary number representations comprising the steps of

(1) testing each binary digit position $i$, beginning with the least significant binary digit position, of the most significant decimal digit representation for a binary "0" or a binary "1";

(2) if a binary "0" is detected, repeating step (1) for the next least significant binary digit position of said most significant decimal digit representation;

(3) if a binary "1" is detected, adding a binary "1" at the $(i + 1)$th and $(i + 3)$th least significant binary digit positions of the next lesser significant decimal digit representation, and repeating step (1) for the next least significant binary digit position of said most significant decimal digit representaton;

(4) upon exhausting the binary digit positions of said most significant

decimal digit representation, repeating steps (1) through (3) for the next lesser significant decimal digit representation as modified by the previous execution of steps (1) through (3); and

(5) repeating steps (1) through (4) until the second least significant decimal digit representation has been so processed.

As to these claims, no prior art is cited and no question is raised as to utility, novelty, or unobviousness. The asserted advantages and the implicit advance resulting therefrom in the data-processing art, have not been questioned.

### The Rejection

The first problem it is necessary to settle is what the ground or grounds of rejection is or are. Appellants' brief correctly states, "the only explicit rejection outstanding against claims 8 and 13 is the rejection on the grounds [sic] that these claims are directed to subject matter not embraced by Section 101." Study of the two Examiner's Answers makes it clear that that was the only ground he relied on. In his first Answer the examiner specified that "all grounds of rejection are withdrawn. except the art rejections and nonstatutory subject matter rejections." We no longer have any art rejections. In his second Answer, on remand, he said:

In summary, the remaining ground or rejection of claims 8 and 13 now in the case is that these claims are directed to non-statutory subject matter.

In reciting what the rejection was, the board opinion says:

Claims 8 and 13 stand rejected as for subject matter not embraced by 35 U.S.C. 101 in that they set forth "mental processes" and "mathematical steps," neither being an "art" as construed by a long line of decisions * * *.

Nowhere does the board opinion indicate that any new ground of rejection is being made.

In. discussing appellants' arguments traversing the contention that the claims are directed to non-statutory subject matter, the board, answering the argument that "The only way applicants' claims can be construed to include mental steps is to construe them contrary to the disclosure rather than in accord therewith," made the following somewhat off-the-point observations:

We are not convinced by appellants' arguments to the effect that the disclosure in an application, not the claims thereof, should be the proper basis for judging whether the claims are drawn to subject matter outside the statute. Certainly a claim which embraces that which was already in the prior art or was obvious therefrom could not be sustained under 35 U.S.C. 102 or 103 merely because there may have been something patentable disclosed in the specification. 35 U.S.C. 112 [2d par., 1st sentence] *requires the claim to point out the subject matter which the applicant regards as his invention so that a claim which is so broad and indistinct as to embrace within its terms subject matter that can not be patented under section 101 of the statute, similarly must be unpatentable.* [Emphasis ours.]

While from that point on in its opinion the board discussed the breadth of the claims and what in its opinion they cover, it never so much as suggested that the claims are "indistinct" or do not point out "the subject matter which the applicant regards as his invention." The board did not again refer to section 112 nor in any way suggest failure of the claims to comply with the second paragraph of that section and merely affirmed the rejection on the ground that the claims, as it read them, were directed to methods which are non-statutory under section 101. It is our opinion that up until the time of the appeal to this court there was only one ground of rejection relied on and that was noncompliance with section 101.

However, apparently out of an abundance of caution and noting the board's

reference to section 112 in the above-quoted passage, as well as a similar passage in the Examiner's Answer on Remand,[2] appellants' main brief, toward its end, says of the italicized passage in the above quotation from the board's opinion that it could be construed as another example similar to the sections 102 and 103 example preceding, *or it could also be construed as an entirely new ground of rejection under section 112,* simultaneously deploring the "vagaries of prosecution [which] leave some of the basic issues in doubt." Appellants thereupon spent a page of their brief stating their reasons why a rejection under the second paragraph of section 112, *if* such had been made, would be in error. That would seem a cautious thing to do but it does not bring such a rejection into the case unless it was already there.

The brief for the Patent Office trades heavily on this situation. On page 2 it quotes appellants as saying that they "have no alternative but to consider a rejection under Section 112 as having been raised and requiring a response" and proceeds to the conclusion that "A rejection under 35 U.S.C. 112, 2nd paragraph, would thus also appear to [be] present," pointing out that a reason of appeal in appellants' Notice of Appeal alleges that the board erred

* * * in sustaining the Examiner's rejection of claims 8 and 13 as failing to point out the subject matter which appellants regard as their invention under 35 U.S.C. 112 in that the claims are so broad and indistinct as to embrace within their terms subject matter that can not be patented under 35 U.S.C. 101.

This, it will be seen, is a close paraphrase of what the board said in the paragraph quoted above. It was an appropriate reason of appeal to file to cover the contingency that what the board said might be a new ground of rejection. The Patent Office brief goes on to argue, it would seem as its *principal* contention,[3] not that the claims are directed to non-statutory subject matter because directed to mental or mathematical steps, which do not constitute an "art," [4] *but* that "the rejection under 35 U.S.C. 112 should be affirmed" because appellants admitted during prosecution that their process is capable of manual implementation with the aid of pencil and paper, that this is "beyond that which they presently regard as their invention," and that the claims must be rejected *under section 112* by reason of our decision in In re Prater and Wei, 415 F.2d 1393, 56 CCPA 1381, (1969).

2. Continuing the statement quoted above as the first quotation in this section, the examiner said:

The method set forth is by applicants' own assertion "directed to a machine algorithm"; and as understood recites a series of steps for manipulation of data required to be carried out by a programmed computer. Such a method, set forth in this manner, is not considered to properly set forth a process within the meaning of 35 USC 101, in light of prior decisions and the requirements of 35 USC 112. The subject matter of the claims is thus deemed non-statutory.

That paragraph by the examiner therefore begins and ends with the summary statement of his position that *the* single ground of rejection is that the claims are directed to non-statutory subject matter under 35 USC 101. In short, a method carried out by a programmed computer is non-statutory. His reference to section 112 is not clear as to its purpose and seems superfluous.

3. More than 5 of the 7 pages of argument are devoted to this point. The brief begins by stating, however, that

The principal rejection, of course, is that "[c]laims 8 and 13 stand rejected as for subject matter not embraced by 35 U.S.C. 101 in that they set forth 'mental processes' and 'mathematical steps,' neither being an 'art' * * *"

4. The term "art," of course, is the term used in the statutes prior to 1953, the term now being "process" (35 USC 101) which is defined to include "art or method" (35 USC 100(b)). The board used the term "art" because it was referring to a number of pre-1953 cases which dealt with the meaning of that term in R.S. 4886, old Title 35 USC, section 31.

## OPINION

We have decided a number of cases in the general field of computer science in addition to the *Prater* case, supra, since the briefs in this case were filed which we list here for convenient reference:

In re Bernhart, 417 F.2d 1395, 57 CCPA 737, (1969)

In re Mahony, 421 F.2d 742, 57 CCPA 939, (1970)

In re Musgrave, 431 F.2d 882, 57 CCPA 1352, (1970)

In re Foster, 438 F.2d 1011, (1971)

This is an appropriate place to point out a significant difference between most of those cases and the present case. The claims in this case are directed solely to the art of data-processing itself whereas in most of the above cases some subsidiary or additional art was involved. In *Bernhart* it was "Planar Illustration Method and Apparatus" by which two-dimensional illustrations of three-dimensional objects could be produced; in *Mahony* we were concerned with data-processing itself in that the invention was a method of locating the framing bits in a bit stream; in both *Musgrave* and *Foster* computers were used to process seismograms; and in *Prater* the invention related to the spectographic analysis of gases. All of the above cases and the present case have in common, however, the fact that they are the outgrowth of a blanket Patent Office policy, which remained in existence for some time after the decision of the board in this case, to deny claims such as those before us here on the ground that they were not for statutory subject matter.[5] This policy was later modified.[6] The decision here for review is a typical product of its time.

Reverting now to the first problem which confronts us, what rejection do we have before us for decision? We conclude, appellants' apprehension notwithstanding, that the examiner and the board relied on only one ground, predicated on 35 U.S.C. § 101, that claims 8 and 13 are either directed to or at least embrace non-statutory subject matter. Neither of them complained that the claims are unclear, ambiguous, indistinct, or otherwise incomprehensible so as not to comply with section 112, second paragraph. In *Mahony* we made it clear that "To inject any question of statutory subject matter into that paragraph is to depart from its wording and to complicate the law unnecessarily." The solicitor's attempt to build up a rejection on section 112 in order to defeat appellants under the second *Prater* case decision—a decision not rendered until five months after appellants filed their main brief in this court—must fail. It would have to fail in any case for, as appellants point out in their reply brief, in *Prater* appellants admitted in the course of the appeal that their claims read on a mental step implementation and we based our decision on that admission insofar as we affirmed the rejection, whereas here appellants have made no such admission and, for reasons hereinafter stated, we do not think the claims read on any "mental step" implementation.

We turn then to consideration of what the solicitor's brief admits is the "principal rejection" predicated on section 101, which we find to be the only rejection.

### Claim 8

We have set forth claim 8 above and have stated that the examiner and board rejected it because they considered it to be directed to "mental processes" and "mathematical steps." The reasoning of the board's opinion bears a remarkable

5. For a full exposition of that policy see the speech of Commissioner of Patents Brenner of October 22, 1968, which is part of the proceedings of that year of the Computers-in-Law Institute, National Law Center, George Washington University, section B–1, entitled "The Future of Computer Programs in the U. S. Patent Office."

6. See the speech by Commissioner Schuyler, October 8, 1969, 1969 Computers-in-Law Institute, Section H, entitled "Protecting Property in Computer Software."

similarity to the opinion of the board in *Musgrave*, which is not surprising since it was the same board and the opinion was by the same member. The same line of cases is relied on here that was relied on in *Prater* and *Musgrave* and we have given them full consideration before, particularly in those two cases in which we considered at length the "mental steps" doctrine. One of the many sound ideas expressed in the concurring opinion delivered by Judge Baldwin in *Musgrave* is "that in reality very little remains [as a result of our recent decisions] of the 'mental steps' doctrine." Another is that as a result of *Prater* and *Mahony*—if, indeed, it has not always been so [7]—there is a "standard of reasonableness" in the interpretation of claims which is that they should be given the meaning they would have "to one of ordinary skill in the pertinent art when read in light of and consistently with the specification." The question Judge Baldwin asked in *Musgrave* is the question we have here: " * * * would a *reasonable* interpretation of the claims include coverage of the process implemented by the human mind?" The answer clearly is "No," for the same reasons it had to be "No" in *Mahony* and in *Musgrave*. Claim 8 is for a method to be practiced in part on particular *apparatus* specified to be a "reentrant shift register." The first sentence of a three-paragraph definition of "shift register" in the "Condensed Computer Encyclopedia" edited by Jordain, McGraw-Hill Book Co. (1969), is: "A hardware element constructed so as to perform the shifting of its contained data." At argument, the Patent Office Solicitor admitted that the reference to this piece of apparatus in the claim was, for him, its "most embarassing phrase." It is not only a phrase, it is referred to expressly in elements (1), (2), (3), (4) and (7) and by implication in element (5) which refers to "shifting." Claim 8, moreover, refers to the operations of storing, shifting, and masking "signals" which, by a *reasonable* interpretation in the light of the specification, can only mean signals of the kind upon which the disclosed electronic digital computer hardware operates. The signals are like the "bits" and "bit streams" with which we were concerned in *Mahony*. Claim 8 therefore covers only a machine-implemented process and the apparatus for carrying it out has been disclosed. The process can be carried out with no intervention by a human being once the apparatus is set up—that is to say, the appropriate computer system has been assembled and programmed. The solicitor would have us hold the method is not a "process" within section 101 on the ground that a programmable computer is merely a "tool of the mind" and the method is basically "mental" in character, apparently because the "workstuff" of the method is numbers which are mathematical abstractions. As the Patent Office would say, we do not find the argument persuasive. Cash registers, bookkeeping machines, and adding machines also work only with numbers but this has never been considered a ground for taking them out of the "machine" category of section 101.

### Claim 13

This claim was rejected on the same ground as claim 8 from which it differs in containing no reference to any apparatus and in referring to the thing operated upon not as "signals" but as "representations." The claimed method is one for converting "binary coded decimal number representations" into "binary number representations." The supporting disclosure against which the claim must be reasonably interpreted is the identical programmed digital computer system which supports claim 8. The operational steps to be carried out call for "testing each binary digit position" to determine whether it is a "binary '0'" or

7. See "Patent Claims" by Ridsdale Ellis (1949), Chapt. 3, entitled "General Rules of Claim Construction" especially Secs. 21, 22 referring to reasonableness in claim interpretation and citing decisions of the Court of Appeals for the District of Columbia in 1924 and 1915.

a "binary '1' " and performing a specified act according to what is found, i. e., moving to the next position if it is "0" and repeating the test or adding a binary "1" at two specified positions and then moving to the next position, and so on, each action being prescribed so that no human judgment or decision is required —merely observation and taking prescribed action according to what is observed. Apparatus, machinery, "hardware"—whatever it may be called—is disclosed by which the steps *can* be carried out without human intervention but at the same time, since the claim does not itself call for any particular hardware, the method within the claim can be practiced either with apparatus other than that described or with the simplest of equipment which will enable one to provide and to manipulate "binary coded decimal representations" and convert them into "binary number representations." This could *in theory* be any kind of writing implement and any kind of recording medium—"pencil and paper"— or even, we suppose, red and blue poker chips and a surface to put them on or slots to put them in so that "0"s and "1"s can be represented.

It will aid in understanding the terms of claim 13 to state that the discovery which is the essence of appellants' invention was that, for each bit position in each BCD digit, conversion can be accomplished by adding a binary "1" to two specific bit positions of the next lesser significant BCD digit and that in normal notation "significance" of bits or digits increases to the left, e. g., in the decimal number "53" the 5 is more significant than the 3. Thus conversion can be carried out by the steps of (1) testing each BCD bit position for all but the least significant BCD digit and (2) for each "1" bit detected, adding a binary "1" to each of two specified bit positions in the next lesser significant BCD digit.

The only argument put forward by the Patent Office for holding claim 13 nonstatutory under section 101 is that the method is basically "mental" in character. Looking at the present case in the light of all its circumstances, we observe in claim 13 a process consisting of a sequence of steps which can be carried out by machine implementation as disclosed in the specification, by still another machine as disclosed during the prosecution, and even manually although in actual practice it seems improbable anyone would ever do that, speed measured in milli-or even micro-seconds being essential in the practical utilization of such a process. Only in the manual performance would it require the operator even to think and then only to the extent necessary to assure that he is doing what the claim tells him to do. In no case is the exercise of judgment required or even the making of a decision as between alternatives.

Realistically, the process of claim 13 has no practical use other than the more effective operation and utilization of a *machine* known as a digital computer. It seems beyond question that the machines—the computers—are in the technological field, are a part of one of our best-known technologies, and are in the "useful arts" rather than the "liberal arts," as are all other types of "business machines," regardless of the uses to which their users may put them. How can it be said that a process having no practical value other than enhancing the internal operation of those machines is not likewise in the technological or useful arts? We conclude that the Patent Office has put forth no sound reason why the claims in this case should be held to be non-statutory.

The decision of the board is reversed.

Reversed.