**Application of Thomas R. JOHNSTON.**

**Patent Appeal No. 9088.**

United States Court of Customs and Patent Appeals,

Sept. 19, 1974.

Markey, C. J., and Rich, J., dissented and filed opinions.

Morton C. Jacobs, Philadelphia, Pa., attorney of record, for appellant, McClure, Millman & Jacobs, Philadelphia, Pa., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Jere W. Sears, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals rejecting claims 20–24 [1] of appellant's application.[2]

*The Invention*

Appellant's invention relates to an automatic financial record-keeping system which employs a digital computer. The application states:

> Automatic data processing equipments employing digital computers have been developed for the handling of much of the record-keeping operations involved in a banking system.

1. The board's decision concerned claims 1–11 and 16–27, but appellant has only appealed the rejection of claims 20–24.

2. Serial No. 624,741, filed March 21, 1967.

The checks and deposit slips are automatically processed by forming those items as machine-readable records; that is, magnetic ink characters are imprinted on the check, so that magnetic readers are enabled to process these checks and enter the data in a computer system in the form of coded electrical signals. Other character-reading machines operating on an optical principle for automatically reading special optical type fonts are also employed. With such machine systems, most of the extensive data handling required in a bank can be performed automatically.

It has been found that such data processing equipment, with certain additions and modifications, can be employed to process automatically much, if not all, of the individual record keeping required by a bank's customers to maintain their own personal and business financial records. That is, as a supplement to the conventional, periodic bank statement furnished to a bank customer, a record summary is provided with [sic] makes unnecessary much or all of the tedious bookkeeping and accounting that the customers would otherwise have to perform.

\* \* \* \* \* \*

In accordance with an embodiment of this invention, an automatic record-keeping system is provided which is especially adapted for use with automatic banking devices · for machine handling of the transactions (i. e. checks or deposits) of demand-deposit accounts of bank customers. Machine-readable records of each bank transaction are generated directly on the check or the deposit ticket. The data of such records incorporate those required for conventional banking systems presently carried on checks (or deposit tickets); namely, the customer's account number, amount of the transaction, and the type of transaction (that is, whether a check or a deposit). Another set of data forming a machine-readable record is provided on each transaction, namely, a set of code characters that identify the bookkeeping classification of each transaction; this classification code is called the "category number." [e. g., categories indicating different sources of income for which deposits are made and categories indicating different types of expenses for which checks are written.] The category number is entered by the customer on each transaction slip (check or deposit) at the time it is prepared, in the form of a machine-readable record by means of an appropriate device, or in the form of a set of hand-written numeric characters which are converted to a machine-readable record by the customer's bank.

In the customer's bank, upon a deposit being made or a check clearing the bank, the machine-readable transaction records on the imprinted checks or deposit tickets are read by a suitable document-reader device and stored in a transaction file. To process the transaction file, the automatic record-keeping system employs a data processor, such as a programmable electronic digital computer, having certain data storage files and a control system. In addition to the transaction file, a master record-keeping file is used to store all of the records required for each customer in accordance with the customer's own chart of accounts. The latter is individually designed to the customer's needs and also constructed to cooperate with the control system in the processing of the customer's transactions. The control system directs the generation of periodic output reports for the customer which present the customer's transaction records in accordance with his own chart of accounts and desired accounting procedures.

The control system is described as comprising a general control which is applicable to the processing operations that are common to most customers and a master control for the operations that

vary on an individual basis with each customer. The general control, as allegedly reduced to practice, is in the form of a software program, and the master control is a series of sub-files, one for each customer, which are in the form of a sequence of records containing suitable control mechanisms and the customer's financial data.

The application contains schematic block and flow diagrams of the entire apparatus including detailed descriptions of each diagram which set forth the interrelationships between all the disclosed elements of the apparatus. The application also discloses a print-out of a complete program and a detailed flow chart thereof for use with a known commercial general-purpose computer, the IBM 1400 series, to provide the special-purpose computer which forms the apparatus of appellant's invention.

Claim 20 is exemplary:

20. A record-keeping machine system for financial accounts, said system comprising a data processor including a memory for storing combinatorially coded signal records;

a processor for combining and comparing the coded signals of said records;

input and output devices;

and a control system for supervising and directing said other parts of said data processor to perform a certain sequence of operations;

said memory including a storage file of a plurality of machine-readable records formed of coded combinatorial signals, a master section of said file including a plurality of predeterminedly sequenced sub-files of said records, each said sub-file including a different signal group record for a certain one of a plurality of account identifications, a plurality of predeterminedly sequenced different signal group records for different record-keeping category codes individually associated with reach of said account identification records, a plurality of different group records each for an amount total associated with a different one of said category records, and a plurality of totalizing operation records individually associated with certain pluralities of said category records and sequenced with the associated category records, a transaction section of said file including different pluralities of sub-files of said records, each of said transaction sub-files including one of said account identification signal group records, one of said associated category signal group records, and a separate transaction amount signal group record associated with each of said category records;

said control system including means for directing the processing of said files in accordance with the predetermined sequences of said master sub-files and of said category records of each sub-file, said processing directing means including means for locating in said master file section, for each of said transaction sub-files, that one of said category records corresponding to the transaction account identification record and the transaction category record and for augmenting the associated master amount total record by the amount records of the corresponding transaction sub-file; and

means for producing an output record for each of said master sub-files;

said output record producing means including means for identifying each of said master sub-file category records and for producing an output listing of the sub-file category codes and of the associated category amount total from said records, means for directing the accumulation of the amount totals of successive ones of said category records, and means for identifying each of said totalizing records and for producing an output record of said accumulation of totals of the preceding category records. [paragraphing ours].

## The Rejections

The examiner rejected all the claims in appellant's application under 35 U.S.C. § 112 and 35 U.S.C. § 102; however, the board did not consider the underlying bases for these rejections to be valid and did not sustain these rejections.[3] However, under the provisions of Rule 196(b), Rules of Practice in Patent Cases,[4] the board then entered five new rejections under the provisions of 35 U.S.C. § 112, 35 U.S.C. § 101, and 35 U.S.C. § 103.[5]

### Rejections Under 35 U.S.C. § 112

The board's first rejection of the claims is under the provisions of the second paragraph of § 112 in that the claims fail to particularly point out and distinctly claim that which appellant considers to be his invention.

The board stated:

Appellant * * * [in] his specification acknowledges that automatic data processing equipment has already been developed for the financial record-keeping and statement-furnishing operations of a bank so that the rendering of these services merely by some form of automatic data processing, not including appellant's improvements thereover, was not considered to be appellant's invention.

Turning now to the appealed claims, both apparatus and method,[6] we find them not directed to improved record keeping machinery, but rather to a broad system of keeping financial records where the distinction over acknowledged prior record-keeping is either in the identity of the person or institution which has custody of certain phases of the bookkeeping operation or in the financial meaning of, or the relationship existing between, the various records. Thus, the broad sweeping reference in the claims to the automation of the banking industry serves only as a dress for claims that spell out, in effect, the relationship of a bank and its customers, not any particular configuration of business machinery.

The board's second rejection under the provisions of § 112, second paragraph, was labeled indefiniteness. The board reasoned that portions of appellant's apparatus are defined as means for identifying an account or type of transaction and that this "identification of the meaning represented by a section of the computer memory is in the mind of the

---

3. The board found that the examiner had based his rejections upon the premise "that an unprogrammed, or a differently programmed, general purpose computer is the same machine as the one that would result from appellant's programming of the same or of a similar computer." The board acknowledged that neither it nor this court considers that premise to be valid, obviously referring to In re Bernhart, 417 F.2d 1395, 57 CCPA 737 (1969).

4. 196. Decision by Board of Appeals

* * * * *

(b) Should the Board of Appeals have knowledge of any grounds not involved in the appeal for rejecting any [appealed] claim, it may include in its decision a statement to that effect with its reasons for so holding, which statement shall constitute a rejection of the claims. The appellant may submit an appropriate amendment of the claims so rejected or a showing of facts, or both, and have the matter reconsidered by the primary examiner. The statement shall be binding upon the primary examiner unless an amendment or showing of facts not previously of record be made which, in the opinion of the primary examiner, avoids the additional ground for rejection stated in the decision. The applicant may waive such reconsideration before the primary examiner and have the case reconsidered by the Board of Appeals upon the same record before them. Where request for such reconsideration is made the Board of Appeals shall, if necessary, render a new decision which shall include all grounds upon which a patent is refused. The applicant may waive reconsideration by the Board of Appeals and treat the decision, including the added grounds for rejection given by the Board of Appeals, as a final decision in the case.

5. The appellant did not seek any reconsideration provided for by Rule 196(b) and appealed directly to this court.

6. The presently appealed claims 20–24 are all apparatus claims.

user and cannot define any characteristic of the apparatus." Relying upon the following passage from In re Foster, 438 F.2d 1011, 1015, 58 CCPA 1001, 1006, (1971):

> Judge Baldwin in the second Prater opinion [Application of Prater, 415 F.2d 1393, 56 CCPA 1381 (1969)] made it clear that means-plus-function language such as that used in the present apparatus claims does not encompass the human being as the "means" or any part thereof [,]

the board held the claims to be indefinite insofar as they purportedly encompassed a human being as a part of the claimed apparatus.

### Rejection Under 35 U.S.C. § 101

Under the provisions of § 101 the board rejected all the claims as claiming non-statutory subject matter. After reviewing the holdings of prior opinions of this court, e. g., In re Foster, supra; and In re Musgrave, 431 F.2d 882, 57 CCPA 1352 (1970), which held that computer related inventions were "statutory" subject matter if they were within the "technological arts," the board inferred that computer related inventions which "extend beyond the field of technology are not within the 'technological arts' and are non-statutory." After noting that the term " 'technological arts' should [not] embrace processes of using machines so as to dominate practices in the 'liberal arts,' such as social or political sciences, humanities, music and art," the board stated:

> A granting of the instant claims would, in effect, grant a monopoly to appellant on a method of conducting the banking business since banks would thereby be restricted to the use of their data processing equipment only for their own bookkeeping and not being allowed to freely expand into the business of keeping books for their customers.

The granting of claims which would allow the intrusion of the patent system into the social sciences already under regulation by governmental agencies would exceed the constitutional grant of authority to issue patents in the "technological arts."

### Rejections Under 35 U.S.C. § 103

All the claims were further rejected under the provisions of § 103 as being "obvious variations of either the system of bookkeeping by banks that was acknowledged to be old by appellant . . . . [in his] specification [7] or the system of bookkeeping of the Dirks patent.[8] when applied to banking rather than industrial business."

The board noted that individual bank customers frequently have plural accounts, such as "trust" or "escrow" accounts, and that the names of these accounts is a "category code" as required by the claims. The board acknowledged that, although a bank may regard those accounts as separate accounts, its treatment of those accounts is the same as that accorded appellant's different category codes, inasmuch as "the bookkeeping in the separate special accounts of a single customer correctly credits and debits the same and renders periodic summary statements of account to the customer." Therefore, the board opined:

> Merely printing the summary sheets for all the special accounts of an individual on a single document with totals for all accounts would be an obvious convenience to both the bank and the customer.

As to the rejection of the claims as unpatentable over the Dirks patent, the board stated:

> Dirks discloses a comprehensive automatic data processing system for many different purposes in networks of individual departments of a large

---

7. This portion of the specification is reproduced in this opinion under *The Invention* section, *supra*.

8. U. S. Patent No. 3,343,133, issued September 19, 1967, on an application filed August 9, 1963.

business corporation * * *. This system allows personalized files for localized areas of responsibility * * *. Each area is assigned an account number in which transaction and balance files are kept and updated * * *. The bookkeeping is on a cost accounting basis * * * such as for sales of a product.

There is no fundamental difference in a data processing apparatus or method because of the nature of the goods involved in a sales transaction. The bookkeeping apparatus and method would be the same no matter whether the amount debited represented the value of the merchandise or the value of the extended credit.

Accordingly, it would have been obvious to a person of ordinary skill to use the cost accounting portion of the Dirks system of bookkeeping in the banking rather than the mercantile business.

## OPINION

Considering first the rejections under the second paragraph of .§ 112, we find the instant apparatus claims to be in compliance with the requirements set forth in that section of the statute. These requirements were recently discussed by this court in In re Knowlton, 481 F.2d 1357, (Cust. & Pat.App.1973).

■ In essence, the "failure to particularly point out and distinctly claim" rejection [9] is based upon the board's conclusion that the "relationship of a bank and its customers, not any particular configuration of business machinery", is being claimed. Upon reading the appealed *apparatus* claims we cannot perceive how any such "relationship" is being claimed. In typical means-plus-function language, which is expressly sanctioned by the third paragraph of § 112, the appealed *apparatus* claims are clearly drawn to a "record-keeping *machine* system for financial accounts" (emphasis added). Accordingly, we cannot sustain the board's rejection on its stated grounds.

■ The board's rationale underlying its second rejection under § 112 for indefiniteness [10] appears to be the same as that found to be defective in In re Foster, *supra*. Here, as in *Foster*, we find the appealed *apparatus* claims clearly read only upon the subject matter which appellant regards as his invention—a "record-keeping *machine* system for financial accounts" (emphasis added)—not a human being inside or outside appellant's apparatus. Appellant's specification makes it quite clear that the claimed *apparatus* automatically performs the identifying operations referred to by the board; those operations are neither actually performed by a human being, nor can we imagine how they could be realistically performed by a human being. See In re Bernhart, *supra*. Thus, we cannot sustain this rejection on the board's stated rationale.[11]

9. We note that although the "failure to distinctly claim" language used in the board's rejection connotes a rejection for indefiniteness, In re Knowlton, *supra*, the sole basis for its rejection was that appellant was claiming something—a relationship between a bank and its customer—other than what appellant regarded as his invention, *i. e.*, a failure to particularly point out the subject matter which appellant regards as his invention. Accordingly, we treat the rejection on this basis.

10. Although the board held the claims to be indefinite, we again find the sole basis of the rejection was that appellant was claiming something—a human being—other than what appellant regarded as his invention. Thus, we also treat this rejection on this basis.

11. The solicitor argues that the board had another basis for its indefiniteness rejection, namely that the means-plus-function recitations in the claims are indefinite for lack of any corresponding descriptions of structure in the specification upon which the scope of equivalents might be based in accordance with the third paragraph of § 112.

However, we cannot agree with the solicitor that the board set forth any such basis for its "indefiniteness" rejection. Furthermore, the thrust of this proposed rejection indicates that it would have been properly made under the *first* paragraph of § 112. See In re Comstock, 481 F.2d 905, (Cust. & Pat.App.1973), In re Knowlton, *supra*. See also In re Bernhart, *supra*.

■ With regard to the rejection under § 101, we cannot agree with the board that the apparatus of the appealed claims is not within the "technological arts." [12] Record-keeping *machine* systems are clearly within the "technological arts." Such *machine* systems, which comprise programmed digital computers, are statutory subject matter under the provisions of § 101, and "claims defining them must be judged for patentability in light of the prior art." In re Bernhart, *supra*. Furthermore, we are not aware of, nor can we locate, any dictionary which would define a *machine* system as within the purview of the "liberal arts." [13]

The board's reluctance to "grant a monopoly to appellant on a method of conducting the banking business" is misplaced. The appealed apparatus claims are not drawn to cover either a method of doing business or even a method of bookkeeping. Nor would banks "be restricted to the use of their data processing equipment only for their own bookkeeping and not * * * [be] allowed to freely expand into the business of keeping books for their customers." Obviously, banks would be free to so expand their services and use any apparatus they may desire *except* the apparatus set forth in appellant's claims. We do not find that situation to be in conflict with Article I, Section 8, of the Constitution, since the "right to exclude others" is the very heart of our patent system.

Additionally, the solicitor argues that the holding in the recent opinion of the Supreme Court in Gottschalk v. Benson, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) is logically applicable to the instant apparatus claims. However, as we stated in In re Christensen, 478 F.2d 1392 (Cust. & Pat.App.1973):

The issue considered by the Supreme Court in *Benson* was a narrow one, namely, is a formula for converting binary coded decimal numerals into pure binary numerals by a series of mathematical calculations a patentable *process*? (emphasis added).

Furthermore, the instant claims, in *apparatus* form, do not claim or encompass a law of nature, a mathematical formula, or an algorithm. For these reasons, we do not find the holding of *Benson* to be applicable to claims of the type now before us.

■ Finally, we reach the rejections under § 103. In determining whether or not appellant's record-keeping machine system is an obvious variation of the bookkeeping systems which were acknowledged by appellant to be known in the art, "we must view the prior art without reading into that art appellant's teachings." In re Sponnoble, 405 F.2d 578, 56 CCPA 823 (1969).

■ We cannot agree with the board that the claimed "category codes" are equivalent to the account numbers of separate accounts that a customer may have with one bank. Appellant's "category codes" and account numbers [14] are two different types of controls, as appellant's specification and claims clearly point out. Furthermore, appellant's claimed invention produces a breakdown of a customer's income and expenditures associated with a *single* account and is not directed to the board's proposed modification of known data processing apparatus to provide a customer with merely a summary sheet consisting of net totals of plural separate accounts which a customer may have at a bank. Although it may possibly be obvious to modify known record-keeping apparatus to achieve a summary sheet of a plurality of separate accounts, as proposed by the board, we conclude that any further modification to such known apparatus, in order to achieve the results of appellant's claimed apparatus, would not have

---

12. "The phrase 'technological arts,' * * * is synonymous with the phrase 'useful arts' as it appears in Article I, Section 8 of the Constitution." In re Waldbaum, 59 CCPA 940, 457 F.2d 997 (1972).

13. We likewise do not agree with the board that banking is a "social science."

14. Claim 20 uses the terminology "account identifications" for account numbers.

been obvious to one of ordinary skill in the art who did not have appellant's specification before him.

Turning to the obviousness rejection based upon the patent to Dirks, we conclude that this reference does not render the subject matter of the appealed claims obvious to one of ordinary skill in the art. The four brief portions of the Dirks specification [15] referred to by the board and the additional passages of that specification called to our attention by the solicitor simply are not suggestive of the subject matter of the appealed claims. We find that, with appellant's specification before them, the board and solicitor have merely chosen various portions of the Dirks apparatus and have attempted to read them upon various elements set forth in appellant's claims. Furthermore, we note that the solicitor's interpretation of Dirk's apparatus creates substantially the same apparatus as that of the board's proposed modification of known data processing apparatus, *supra,* insofar as the solicitor interprets various *separate* accounts of Dirks as corresponding to appellant's claimed category codes. Accordingly, we cannot sustain this rejection.

For the foregoing reasons, the decision of the Patent Office Board of Appeals is reversed.

Reversed.

MARKEY, Chief Judge (dissenting).

I would affirm the decision of the board on its rejection under 35 U.S.C. 103. In that event, discussion of the rejections under 35 U.S.C. 112 and 101 becomes unnecessary. That we decline to discuss rejections which are thus rendered moot does not, of course, reflect in any way upon the validity or invalidity of such rejections.

The majority opinion finds differences between the claimed subject matter and the prior bank data processing system. Thereupon, the majority opinion appears to treat the obviousness rejection below as though it were based on 35 U.S.C. 102. There is no doubt, as the board recognized, that appellant's programmed computer differs from the conventional programmed computers previously employed in banks. But the question under 35 U.S.C. 103 is whether appellant's programmed computers as claimed, i. e., his "record-keeping machine system," would have been obvious to those skilled in the art applicable to such record-keeping machine systems. In my view one skilled in the art, presented with the conventional machine system, would have found it obvious, without knowledge of appellant's disclosure, to have modified the system as set forth in the appealed claims.

Similarly, I regard the differences between the claimed subject matter and the relevant portions of the Dirks' patent to be such as to have rendered obvious the claimed subject matter as a whole at the time the invention was made. That only portions of the Dirks' specification are relied on by the board is of course, irrelevant if such portions do in fact render obvious the subject matter of the appealed claims. Whether or not Dirks discloses category codes or their equivalent would not appear to be the question. If it did, the rejection might well be under 35 U.S.C. 102. The question is whether the contribution of such category codes by appellant is a difference sufficient to render the claimed subject matter unobvious to one skilled in the applicable art. As above indicated, I differ from my brothers in the majority and would answer that question in the negative.

Thus, I find no clear error on the part of the board in its rejection of the appealed claims under 35 U.S.C. 103. In the absence of such clear error we must, and I would, affirm the decision of the board.

RICH, Judge (dissenting).

On the authority of Gottschalk v. Benson, 409 U.S. 63, 175 USPQ 673 (1972), I would affirm the rejection of the claims on appeal which was made by the

---

15. We note that the Dirks patent comprised 509 pages of the instant Record.

board under § 101, as requested by the Solicitor for the Patent Office.

The board's rejection was in these words:

> Under the provisions of Rule 196(b) this board herewith enters under 35 U.S.C. 101 a further rejection of claims 1 through 11 and 16 through 27 as for subject matter outside the patent statutes.

This is inclusive of claims 20–24 on appeal here. The board did not, of course, have the benefit of the Supreme Court's views in *Benson* because the board decision was on October 27, 1971, and *Benson* was not decided by the Supreme Court until November 20, 1972.

The Supreme Court held the process claims in *Benson* unpatentable under § 101. As the solicitor points out, appellant, in his main brief, ignored the Supreme Court *Benson* decision. In his reply brief he endeavors to deal with it—unsuccessfully, in my view. He attempts to distinguish on the ground that the claims here are directed to machines while *Benson* involved process claims. I think that will not suffice. Appellant has to concede that

> * * * the only resemblance of this case to *Benson* is that of the use of computer programs to embody the invention. Therein lies the rub, for appellee [the Patent Office] would deny patents for all software-embodied inventions.

The board, which was dealing with claims of appellant cast in both process and machine form, said the following, with which I agree:

> We see no essential difference in substance between these apparatus claims which define only broad means for performance of the steps of a data processing method and process claims 25, 26 and 27 which define the steps of the data processing method as being carried out by any conventional data processing machine. Hence, *we consider that both the apparatus and the method claims on appeal must stand or fall together.* [Emphasis added.]

I realize that claims 25, 26, and 27 are not on appeal but I do not take the board's comment as being restricted to them among the process claims. The point is that the machine or apparatus and process claims are really directed to the same invention, of which appellant's main brief says:

> * * * this invention is being sold as a computer program to banks and to other data processing companies so that they can perform these data processing services for depositors.

What could more clearly reveal the reality that the invention is a program—software—and that that is what appellant wants to protect by the appealed "machine system" claims? Appellant did not invent a machine—i. e., "hardware." Appellant's brief further states:

> This machine was reduced to practice in the software form of computer programs * * *.

I am quite familiar with the legal doctrine that a new program makes an old general purpose digital computer into a new and different machine. This court has been through that many times and I am not denying the validity of this principle—which partakes of the nature of a legal fiction when it comes to drafting claims. My problem is that, knowing the *invention* to be a new program, I must decide whether it is patentable in any claimed form in view of *Benson*, whether claimed as a machine, a "machine system," or otherwise. I am probably as much—if not more—confused by the wording of the *Benson* opinion as many others. What the Court *did* in its *decision* reversing the holding of this court that Benson and Tabbot's method claims were patentable subject matter under § 101 contains a message that is loud and clear. If those claims are not to patentable subject matter, neither, in my view, are the claims here, regardless of difference in form. Benson et al. had a program invention too and they could have cast their claims in machine system form just as appellant did. Every competent patent draftsman knows how to do that.

It seems to me important to focus on what the Supreme Cohrt did in *Benson*, rather than on the specifics of its explanation of why it did it. I have no idea what was in the collective mind of the six-justice Court in approving the statements:

It is said that the decision precludes a patent for any program servicing a computer. We do not so hold. * * * It is said we freeze process patents to old technologies, leaving no room for the revelations of the new, onrushing technology. Such is not our purpose.

These are the comforting words to which some inventors of software and owners of software inventions look for solace. I find it more significant to contemplate the identities of the troops lined up for battle in *Benson* and observe which side obtained the victory. On the one side was the Government, against patenting programs or software, supported by the collective forces of major hardware (i. e., computer) manufacturers and their representative associations who, for economic reasons, did not want patents granted *on programs* for their machines. On the other side was Benson et al. and their assignee and assorted lawyers and legal groups who were in favor of patent protection for programs or software. The anti-patenting forces won the victory—if not an altogether clear one—and on the legal principle that the Benson et al. way of programming a computer to do a particularly useful job of general applicability in the data processing field was the kind of invention the Supreme Court would not approve patenting without prior consideration by and specific authorization from the Congress. The major part of the rather brief and now famous "nutshell" conclusion of the Court's opinion dwells heavily on this point.

I can find no realistic distinction in kind between the Benson et al. invention and the invention here and I conclude that the *Benson* decision requires us to affirm the rejection of claims 20–24 as directed to non-patentable subject matter under 35 U.S.C. 101. Holding that view, I find it unnecessary to consider the remaining four grounds of rejection discussed by my colleagues.

It has been suggested that the position I am taking is inconsistent with the position I have taken or the views I have expressed in others of the many carefully reasoned opinions of this court on the statutory subject matter question under 35 U.S.C. 101 which led to *Benson*, none of which was discussed or even recognized in the Supreme Court's *Benson* opinion. As a result, the value of those opinions as precedents has become unsettled.

It may well be that I seem to have been inconsistent. As the author of the opinion of this court in *Benson*, which was wholly reversed, I have not been persuaded by anything the Supreme Court said that we made a "wrong" decision and I therefore do not agree with the Supreme Court's decision. But that is entirely beside the point. Under our judicial system, it is the duty of a judge of a lower court to try to follow in spirit decisions of the Supreme Court—that is to say, their "thrust." I do not deem it to be my province as a judge to assume an advocate's role and argue the rightness or wrongness of what the Court has decided or to participate in what I regard as the inconsistent decision here, supported by a bare majority which tries in vain, and only briefly, to distinguish *Benson* by discussing form rather than substance and various irrelevancies like pre-*Benson* decisions of this court, the banking business, social science, and the liberal arts. I deem it to be the Supreme Court's prerogative to set the limits on *Benson*, which was broadly based. I hope it will do so. As John W. Davis, erstwhile outstanding Solicitor General, once said, "The first requirement of any judicial opinion is utter clarity."*

---

* Harbaugh, Lawyer's Lawyer, The Life of John W. Davis, Oxford University Press, New York (1973), p. 108.