**Application of A. Michael NOLL.**

**Patent Appeal No. 74–541.**

United States Court of Customs and Patent Appeals.

Nov. 18, 1976.

**142**

William Ryan, atty. of record, Murray Hill, N. J., for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jere W. Sears, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

BALDWIN, Judge.

This is an appeal from the decision of the Patent and Trademark Office (PTO) Board of Appeals (board) sustaining the rejection of claims 2, 7, 8, 9, and 10 of appellant's application for "Raster Scan Computer Graphics System."[1] Claims 1, 4, 5, 6, 11, 12, and 13 stand allowed. We reverse.

### The Invention

The invention relates to a system and apparatus for the display of text or other graphical information on a device such as a cathode ray tube. The data to be displayed are supplied by a computer or similar source in "point-plotting" format in which each element (point, line, character, etc.) is individually specified. The output display device is of the raster-scan or television-like format where a picture is reproduced by selective energization of a repetitively scanned beam. The system involves scan-converting the point-specifying input data into a form suitable for storage in a dot-matrix format for subsequent readout and presentation to the output display device.

The system disclosed in the application is illustrated in Figs. 1 and 2 thereof, reproduced below. The hardware is not disclosed as being novel per se; indeed, various components such as computer 11, scanned display 22, and light pen 26 are described as being well known in the art.

**FIG. 1**

1. Serial No. 8,831, filed February 5, 1970.

FIG. 2.

Referring to Fig. 1, the data to be displayed are supplied from the tape 10 or auxiliary data source 13. They include representations of the rectangular Cartesian (x, y) coordinates of the points represented. Such data are fed to general purpose digital computer 11, which is operated under the control of a program stored in its program memory 21 to scan-convert the data from point-plotting format to a dot-matrix format in the computer memory 19. The specification discloses that the computer 11 is a well-known general purpose computer and that the Honeywell DDP–224 computer is especially well adapted for scan-conversion.

Binary to analog conversion of the scan-converted data is performed in memory display interface device 23, illustrated diagrammatically in Fig. 2. Here, horizontal and vertical pulse generators 204 and 205 are triggered by pulses from master clock 202 and their output passes through analog "OR" circuit 206 to provide a portion of the composite video signal for scanned display device 22 in Fig. 1 (shown as a T.V. monitor device 22 in Fig. 2). Shift register 201 receives scan-converted words from the computer memory and applies them to digital-to-analog converter 203 to supply signals combined with the output of the digi-

tal-to-analog converter in analog "OR" circuit 207 to form the composite video signal. That signal has "the usual characteristics associated with signals supplied to commercial or other television receivers" and results in the illumination of such points in the raster of the tube screen as will graphically represent the original input data.

Item 26 in Fig. 1 is described as a light pen "of standard design" that is "used to provide an indication to computer 11 of the desire by an operator to delete or modify information displayed on display device 22."

Appellant's specification refers to previously used techniques for scan-conversion, including one described in United States patent No. 3,293,614, issued December 20, 1966, to Fenimore et al. This patent discloses a graphic display system in which scan-conversion is achieved by hardwired apparatus. Appellant noted in an amendment [2] to his application:

> Scan conversion, as such, is not new. The concept of establishing, by some means, a dot matrix of the general type used in the present invention is not new. What is new is the claimed data processing method and apparatus for producing the exact functions claimed in claim 1. The detailed functioning is described in

2. Filed in the PTO on March 10, 1971.

the present specification; the programming to accomplish each individual operation specified is obvious to an ordinary skilled worker in the field.

In the same amendment, appellant states that, instead of using specialized (hardwired) circuitry as in the Fenimore system, he employs a "programmable data processor operating under the control of a program" in the scan-conversion. Appellant emphasizes that complete program control with its attendant flexibility distinguishes his invention from the hardwired systems of the prior art.

### The Claims

Allowed claim 1, appealed claims 2, 7, and 8, dependent on claim 1, and appealed claims 9 and 10 are reproduced below:

### Allowed Claim

1. A computer graphics system for displaying in a multi-line, multi-point-per-line format images corresponding to a sequence of input display commands comprising

(A) a programmable data processor operating under the control of a program to convert said display commands into data entries in an array of multi-bit data words, each entry is said array corresponding to a discrete point in the image to be displayed,

(B) a scanned-raster display device for generating illuminated points on a display surface in response to applied data signals and

(C) means intermediate said data processor and said display device and cooperating with said data processor for sequentially accessing said words in said array for presentation to said display device.

### Appealed Claims

2. Apparatus according to claim 1 wherein said program controlled data processor comprises

(1) a memory storing data signals including program control signals and said array of data words, and,

(2) processing means responsive to said program control signals stored in said memory for

(a) interpreting input display commands,

(b) converting said input display commands into location signals for controlling the storage of corresponding digital signals in said array, and

(c) selectively reading data from said array, said means for selectively reading also being responsive to signals from said intermediate means.

7. Apparatus according to claim 1 further comprising

(1) storage means adapted to receive data words from said array, said storage means being further adapted to sequentially read out consecutive bit sequences, each of which bit sequences corresponds to a point in said image,

(2) a light sensitive device for generating a pulse output signal corresponding to a selected one of said illuminated points on said display surface,

(3) programmed data processing means for generating location signals identifying the multi-bit data word most recently transferred from said array to said storage means, and

(4) means responsive to said location signals and said pulse output signal for generating signals identifying approximately said one of said illuminated points.

8. Apparatus according to claim 7 further comprising programmed counter means for generating signals corresponding to the number of said bit sequences which have been read from said most recently transferred data word.

9. Apparatus for scan converting a sequence of first data signals each corre-

sponding to x and y coordinates of a point on an M-line, P-point-per-line display surface into a sequence of corresponding second signals comprising

(I) a plurality of N-bit storage devices, and

(II) programmed data processing means for

(A) interpreting each of said first data signals to extract the specified x and y coordinate information,

(B) generating address signals identifying a location in said N-bit storage devices for each of said sequence of first data signals in response to said x and y information, and

(C) generating and storing the corresponding one of said second sequence of signals in the N-bit storage location specified by said address signals.

10. Apparatus according to claim 9 wherein said programmed data processing means further comprises means for

(1) multiplying said y coordinate by P to form first product signals,

(2) adding said x coordinate to said first product signals to form first sum signals,

(3) dividing said first sum by N to form

(a) a quotient signal corresponding to the address of the appropriate N-bit storage location, and

(b) a remainder signal corresponding to the bit position in said appropriate N-bit storage location at which said corresponding one of said second sequence of signals is to be stored.

Although all claims on appeal recite structures in "means for" language, we note that many of the "structures" called for in the claims are part of the computer as configured to carry out appellant's scan-conversion program. This is most readily observed in claim 10 and can be found to a lesser, but significant, extent in the remaining claims on appeal.

### The Section 112 Rejection

The examiner, in the final rejection, rejected claims 2 and 7–9 [3] "as based upon inadequate disclosure."

He said:

For example, in claim 2, the applicant is claiming processing means comprising a first means, second means, and means for selectively reading data. However, it is not clear from the specification what structure supports the claimed means.

It is not enough to simply cite the Honeywell DDP–224 Computer as adequate support. To establish this precedent would allow an applicant to claim in means plus function language a multitude of computer functions, even to the extent of claiming the DDP–224 Computer itself with little or no supporting structure.

It is presumed that applicant will argue that he is not claiming the DDP–224 or any part of it, but rather is claiming structure that is conditioned in the DDP–224 by the insertion and operation of the program. Even conceding, however, that different structure is conditioned in the computer by the program, the vital question is still: what is the structure?

Claim 1 is adequately supported since element A calls for a programmable data processor and sufficient flow charts and citation of a specific general purpose computer support this element as part of a combination claim. Presumably, this claim will not read on special purpose apparatus performing the same function as element A (this appears to be the distinction over the Fenimore reference),

---

**3.** Claim 10 was merely objected to as dependent on a rejected claim. It was grouped with the rejected claims in an Advisory Action, dated August 30, 1971, without explanation.

since the applicant has specifically claimed a data processor operating under control of a program.

Claim 2, however, attempts to extend claim 1 to specific apparatus contained in the data processor. Therefore, the applicant must show structural support for his claim.

In short, what is the different structure that is conditioned by the operation of the program in the Honeywell Computer. Without knowing the specific structure, it is impractical to determine the metes and bounds of the claim. One would have to translate the program steps into structural cooperation in the computer. This requires a detailed analysis of the computer structure during the running of a program and a specification of what particular structure supports the claimed means.

This burden of determining the structure to support the claims should fall on the applicant. Similarly, claim 7 calls for programmed data processing means and means responsive to location signals. Since claim 1 already calls for a programmed processor, the claim to a programmed data processing means is assumed to be an attempt to incorporate specific structure, unless the applicant intends to add another programmed processor to the combination of claim 1. Similar remarks can be made as to claim 8 and claim 9.

In response, appellant, *inter alia*, amended claims 7 and 9 "to recite only a single programmed processor having a plurality of functions." The above criticism of claims 7–9 was not thereafter repeated. In his brief before the board, appellant stated:

The sole substantial issue to be decided upon the instant appeal is whether apparatus claims may be amply supported in the sense of 35 USC 112, paragraph 1, by a disclosure which is admittedly sufficient for teaching one to practice the corresponding method on a programmed digital computer. That is, given that there is a sufficient disclosure to permit one of ordinary skill in the art to program and operate a general purpose digital computer to perform specified functions, may apparatus claims directed to means for performing these functions issue based on this disclosure?

The examiner, in his Answer, agreed with appellant's statement of the issue, except to note that "apparatus claims must comply with 35 USC 112 paragraph 3[sic 2?] as well as 35 USC 112 paragraph 1." However, he stated that the "sole ground of rejection" was the failure to disclose the detailed internal structure of the computer so programmed. He went on to say:

[A]pparatus claims need apparatus support. To determine what particular apparatus supports the program during its execution requires analysis and translation of the program-hardware combination. * * * It is the Examiner's contention that in order to determine this precise structural support for the claimed functions (and thus be able to delineate the metes and bounds of the claim), the burden of analysis and translation should be on the Appellant and not on the public.

The board incorporated the examiner's remarks by reference and further commented:

[W]e find ourselves in agreement with the examiner, whose remarks with regard to the claims under rejection found in the final rejection and answer, we incorporate by reference. Viewed for what they are, namely apparatus claims, claims 2 and 7 through 9 require supporting disclosure. An inspection of the drawings and the specification leaves us ignorant as to what configuration of elements, electrical or otherwise, go to make up the device which will, for example, perform the steps identified as (a), (b) and (c) used to characterize the "processing means" in

claim 2. As the examiner has indicated in his answer, the public in whose name the patent is granted, and in particular those members of the public who do not wish to infringe it are entitled to know the nature of the support for such claims. The claims are for apparatus and we do not think that the public is provided such information where disclosure critical to the claimed subject matter is supported only by a computer program with its attendant computer.

### The Section 101 Rejection

A majority of the board, acting under 37 CFR 1.196(b), also rejected the appealed claims under 35 U.S.C. § 101[4] for being directed to non-statutory subject matter, citing *Gottschalk v. Benson*, 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273, 175 USPQ 673 (1972). The majority stated:

Although appellant in the case at bar has couched the claims under consideration by us in apparatus form, it seems clear by the language in the specification · * * * and in his brief * * * that he perceives his invention, in fact to lie in the computer program disclosed. If we may paraphrase Gertrude Stein, "a program is a program is a program." Where the only mode of practicing an invention is disclosed by way of a computer program, whether apparatus or method claims are presented, appears to us to be immaterial as to the legal effect. To allow an applicant to secure patent protection by apparatus claims to subject matter, the only disclosure for which is an equivalent computer program, after the decision in the *Benson* et al. case would be, in our opinion, to allow him to do by indirection what the Supreme Court has indicated he should not be allowed to do directly, e. g., obtain protection of the computer program as such.

The third member of the board declined to enter into this new ground of rejection and indicated that it would be better to remand the case to the examiner for consideration of this rejection in light of *Benson* (decided after the Examiner's Answer) and recent decisions of this court.

### OPINION

### The Section 101 Rejection

Unlike the method claims in *In re Chatfield*, Cust. & Pat.App., 545 F.2d 152, (CCPA 1976), decided this date, appellant's claims are drawn to *apparatus* for scan-converting a sequence of first data signals into a sequence of second signals. This apparatus is a "machine" or an "improvement thereof" within the meaning of 35 U.S.C. § 101.

 It is the *claims* which define the invention. The instant claims describe an apparatus, *not* a program. The solicitor and the board cite various instances in the record which allegedly indicate that the appellant "perceives his invention, in fact to lie in the computer program disclosed." How appellant "perceives his invention" is irrelevant to a rejection under 35 U.S.C. § 101, which merely lists the so-called statutory classes of subject matter. Moreover, neither the board nor the solicitor may extract that part of the claimed invention which *they* deem to be novel and test only that part to determine whether it belongs to one of the statutory classes of patentable subject matter. It is the *claimed subject matter as a whole* which must be subjected to this test. This court has stated in *In re Bernhart*, 417 F.2d 1395, 1399, 57 CCPA 737, 743, 163 USPQ 611, 615–16 (1969):

If, in an invention defined by a claim, the novelty is indicated by an expression which does not itself· fit in a statutory class (in this case not a machine or a part thereof), then the whole invention is non-statutory since all else in the claim is old. ·

---

4. 35 U.S.C. § 101 reads:
 Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

We do not believe this view is correct under the Patent Act and the case law thus far developed.

We realize that claims may be drafted in the *form* of one of the statutory classes but in *substance* be directed to non-statutory subject matter. Such was the case in *Gottschalk v. Benson,* supra, where claims to a method for converting binary-coded decimal number representations into binary number representations were held to be unpatentable because directed to non-statutory subject matter.

In *Benson* the Supreme Court considered the claimed method to be too abstract and too sweeping, "a generalized formulation for programs to solve mathematical problems," 409 U.S. at 65, 93 S.Ct. at 254, 175 USPQ at 674. The Court noted that "[t]he claims were not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use." 409 U.S. at 64, 93 S.Ct. at 254, 175 USPQ at 674. Indeed, the Court pointed out that the claimed method could even be performed "without a computer." The Court believed that the grant of the claims at issue in *Benson* would, in effect, "be a patent on the algorithm itself."

■ The instant claims, however, are drawn to physical structure and not to an abstract "law of nature, a mathematical

formula, or an algorithm." *In re Johnston,* 502 F.2d 765, 771, 183 USPQ 172, 177 (CCPA 1974), *rev'd on other grounds,* 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692, 189 USPQ 257 (1976). There is nothing abstract about the claimed invention. It comprises physical structure, including storage devices and electrical components uniquely configured to perform specified functions through the physical properties of electrical circuits to achieve controlled results. Appellant's programmed machine is structurally different from a machine without that program. It thus broadly corresponds to the combination held to be statutory subject matter in claim 18[5] in *In re Bernhart,* supra.

Unlike the invention claimed in *Benson,* the instant claims are limited to a particular technology (computer graphics systems and scan-conversion of graphic information). Furthermore, not all machines for achieving appellant's results are included within the scope of appellant's claims; non-program-controlled machines are clearly excluded. Therefore, we need not and do not decide whether computer programs *per se* constitute statutory subject matter.

We realize that the Supreme Court's opinion in *Benson* contains language interpreted by the board as standing for a general proscription on the patenting of computer programs under 35 U.S.C. § 101.[6]

---

5. Claim 18 in *Bernhart* reads:

A system for providing a planar illustration of a three dimensional object as seen by an observer from a selected observation point in space comprising: signal means providing a first group of signals representing the three dimensional co-ordinates of the location of the observation point and a series of second groups of signals representing the three dimensional coordinates of a series of points of the object, each of said group of signals being referenced to a first co-ordinate system; electronic digital signal processing means coupled with said signal means and programmed to provide a series of third groups of signals corresponding to the two dimensional co-ordinates of the intersection of each line of sight from the observation point to each point of the object with a selected plane in said first coordinate system; and planar illustration means coupled with said signal processing means and responsive to said se-

ries of third groups of signals to provide a planar illustration of the object.

6. The Court in *Benson* stated:

If these programs are to be patentable, considerable problems are raised which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain. [409 U.S. at 73, 93 S.Ct. at 258, 175 USPQ at 677, footnote omitted.] However, "these programs" refers to the specific type of claimed program involved in *Benson* and not to computer programs in general, as evidenced by the Court's preceding statements (409 U.S. at 71–72, 93 S.Ct. at 257, 175 USPQ at 676–77):

It is conceded that one may not patent an idea. But in practical effect that would be the result if the formula for converting [binary-coded decimal] numerals to pure binary numerals were patented in this case. The

However, in that very opinion, the Court stated:

It is said that the decision precludes a patent for any program servicing a computer. We do not so hold. [409 U.S. at 71, 93 S.Ct. at 257, 175 USPQ at 676.]

Judge Rich, in his dissenting opinion in *In re Johnston*, supra, asked the Supreme Court to set the limits on *Benson*:

I deem it to be the Supreme Court's prerogative to set the limits on *Benson*, which was broadly based. I hope it will do so. [502 F.2d at 774, 183 USPQ at 179.]

In its review of *Johnston*, the Supreme Court, referring to its opinion in *Benson*, emphasized that *Benson* was a *limited* holding.[7]

We conclude that *Benson* must be limited to method claims such as those presented in that case. Accordingly, the rejection of claims 2 and 7 through 10 under 35 U.S.C. § 101 is *reversed*.

### The Section 112 Rejection

In our view, the thrust of the § 112 rejection is that appellant has failed to disclose the detailed internal structure of the computer as programmed. We agree with the solicitor that this is the same rejection as that involved in *In re Comstock*, 481 F.2d 905, 178 USPQ 616 (CCPA 1973), and *In re Knowlton*, 481 F.2d 1357, 178 USPQ 486 (CCPA 1973), and that "[t]hose cases, of course, dispose of any enablement question here."[8] The solicitor therefore relies only on 35 U.S.C. § 112, second paragraph.

There is language in the rejection phrased by the examiner and the board, although not as clear as it could have been, providing the basis for a 35 U.S.C. § 112, second paragraph, rejection. That rejection, however, as we implied in *In re Johnston*, supra, cannot stand where there is adequate description in the specification to satisfy 35 U.S.C. § 112, first paragraph, regarding means-plus-function recitations in the claims that are not, *per se*, challenged for being unclear. Footnote 11 in *Johnston* states:

The solicitor argues that the board had another basis for its indefiniteness rejection, namely that the means-plus-function recitations in the claims are indefinite for lack of any corresponding descriptions of structure in the specification upon which the scope of equivalents might be based in accordance with the third paragraph of § 112.

However we cannot agree with the solicitor that the board set forth any such basis for its "indefiniteness" rejection. Furthermore, the thrust of this proposed rejection indicates that it would have been properly made under the *first* paragraph of § 112. See *In re Comstock*, 481 F.2d 905, 178 USPQ 616 (CCPA 1973), *In re Knowlton*, supra. See also *In re Bernhart*, supra. [502 F.2d at 770, 183 USPQ at 176. Emphasis in original.]

The claims in the instant case encompass the means described in the specification, *i. e.*, the specified programmed general purpose computer, and equivalents thereof. The meaning of "equivalents" is well under-

---

mathematical formula involved here has no substantial practical application except in connection with a digital computer, which means that if the judgment below is affirmed, the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself.

It may be that the patent laws should be extended to cover *these programs*, a policy matter to which we are not competent to speak. The President's Commission on the Patent System rejected the proposal that *these programs* be patentable * * *. [Emphasis added and footnotes omitted.]

7. As we observed, "[t]he claims were not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use." * * * Our *limited holding* * * * was that respondent's method was not a patentable "process" as that term is defined in 35 U.S.C. § 100(b). [425 U.S. at 224, 96 S.Ct. at 1396, 189 USPQ at 259. Emphasis supplied and footnote omitted.]

8. Solicitor's brief at p. 3. Similarly, at oral hearing the solicitor said, "I'm here today arguing indefiniteness. I would rather forget about the first paragraph involvement."

stood in patent law, *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950), and an applicant need not describe in his specification the full range of equivalents of his invention, some of which may be nonexistent at the time the application is filed.

Accordingly, the rejection of claims 2 and 7 through 10 under 35 U.S.C. § 112 is *reversed.*

*REVERSED.*

LANE, Judge, dissenting, with whom RICH, Judge, joins.

With deference, I cannot agree with the majority opinion in either its result or the underlying reasoning supporting its result. I would affirm the decision of the board rejecting claims 2, 7, 8, 9, and 10 under section 101. Since I would affirm the section 101 rejection, I find no need to consider the propriety of the examiner's rejection under section 112.

At the outset, I note specific portions of the record and briefs which clearly demonstrate to me that the appealed claims indeed cover programming, albeit disguised in apparatus format. The majority has already noted the amendment filed on March 10, 1971, wherein appellant emphasized that complete program control distinguishes his invention from the hardwired systems of the prior art, such as the Fenimore system. In the specification, abstract of the invention, appellant states:

A computer graphics system is described which includes *a programmed computer for scan converting* point-specifying data into a form suitable for storage in a dot matrix format, and for controlling subsequent sequential (or other) readout and presentation of such data to a television-like scanned display device. [My emphasis.]

The specification later discloses:

[T]hat the scan conversion is performed by computer program methods thereby

permitting a considerable degree of freedom in selecting system parameters * * *.

In his main brief before the board, appellant stated the following:

Thus the issue is raised squarely as to whether the identification of a programmable data processor and a disclosure of a program sufficient to enable one to program the programmable data processor is sufficient to enable one to practice an invention directed to a combination of means for performing the functions of the programmable data processor.

* * * * * *

By way of contrast, it is well to note that applicant regards any such detailed disclosure of the logic circuitry and memory of a computer conditioned by the appropriate programs to not be the best mode of practicing the claimed invention. In fact, it is well known that one of the principal purposes for which most modern programmable processes [sic] have been designed is ease of programming. Thus it is desired that it not be necessary for a programmer to understand the fundamental internal circuit details of the computer.

* * * * * *

Nowhere in the instant application are (non-programmed) modifications to standard programmable machines required to practice the claimed invention, i. e., applicant in the instant application has only directed that the identified computer be appropriately programmed.

Finally, appellant's reply brief before us states:

[A]ppellant's *novel program* is loaded and executed in the cited general purpose computer. [My emphasis.]

I agree with the board majority that the claims here on appeal are properly rejected under section 101 in light of *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, 34 L.Ed.2d 273, 175 USPQ 673 (1972). In that

case, the Supreme Court held that the method claims before it[1] were directed to non-statutory subject matter under section 101. Although the opinion in *Benson* is subject to differing, conflicting interpretations with respect to whether it represents a general proscription on the patenting of computer programs under section 101, I conclude that it does. I draw this conclusion from the following language in *Benson*, 409 U.S. at 73, 93 S.Ct. at 258, 175 USPQ at 677:

> If these programs are to be patentable,[6] considerable problems are
>
> [6] See Wild, Computer Program Protection: The Need to Legislate a Solution, 54 Corn.L. Rev. 586, 604–609 (1969); Bender, Computer Programs: Should They be Patentable, 68 Col. L.Rev. 241 (1968); Buckman, Protection of Proprietory Interest in Computer Programs, 51 J.Pat.Off.Soc'y 135 (1969).
>
> raised which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain. The technological problems tendered in the many briefs before us[7] indi-

[7] Amicus briefs of 14 interested groups have been filed in this case.

cate to us that considered action by the Congress is needed.

The reference to "these programs" in the above quote can only be to computer programs in general as discussed in the immediately preceding paragraph of the opinion, particularly where the Court quotes from the *Report of the President's Commission on the Patent System* (1966). This view is further reinforced by the Court's reference to several articles discussing the problems associated with the patenting of computer programs in general.

Although the holding of the Court in *Benson* may have been narrower than the above quoted language suggests, thus perhaps relegating that quoted language to the status of dicta, nevertheless the dicta remain as an indication of the Court's thinking in this area, which we would be well advised to heed. In this regard, I cannot agree with the majority's reliance on terse, cryptic excerpts found in *Benson* and in *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692, 189 USPQ 257 (1976)[2]

1. Claims 8 and 13 of *Benson* read:

8. The method of converting signals from binary coded decimal form into binary which comprises the steps of—

(1) storing the binary coded decimal signals in a reentrant shift register,

(2) shifting the signals to the right by at least three places, until there is a binary '1' in the second position of said register,

(3) masking out said binary '1' in said second position of said register,

(4) adding a binary '1' to the first position of said register,

(5) shifting the signals to the left by two positions,

(6) adding a '1' to said first position, and

(7) shifting the signals to the right by at least three positions in preparation for a succeeding binary '1' in the second position of said register.

13. A data processing method for converting binary coded decimal number representations into binary number representations comprising the steps of—

(1) testing each binary digit position i, beginning with the least significant binary digit position, of the most significant decimal digit representation for a binary '0' or a binary '1';

(2) if a binary '0' is detected, repeating step (1) for the next least significant binary

digit position of said most significant decimal digit representation;

(3) if a binary '1' is detected, adding a binary '1' at the (i+1)th and (i+3)th least significant binary digit positions of the next lesser significant decimal digit representation, and repeating step (1) for the next least significant binary digit position of said most significant decimal digit representation;

(4) upon exhausting the binary digit positions of said most significant decimal digit representation, repeating steps (1) through (3) for the next lesser significant decimal digit representation as modified by the previous execution of steps (1) through (3); and

(5) repeating steps (1) through (4) until the second least significant decimal digit representation has been so processed.

2. In *Benson*:

It is said that the decision precludes a patent for any program servicing a computer. We do not so hold. [409 U.S. at 71, 93 S.Ct. at 257, 175 USPQ at 676.]

In *Dann v. Johnston*:

Our limited holding [in *Benson*] * * * was that respondent's method was not a patentable "process" as that term is defined in 35 U.S.C. § 100(b). [425 U.S. at 224, 96 S.Ct. at 1396, 189 USPQ at 259. Footnote omitted.]

which allegedly undercut any broad construction of *Benson*. On the contrary, I believe that *Benson* has broad ramifications.

Having concluded that *Benson* represents a general proscription on the patenting of computer programs under section 101, I turn to the claims before us to see whether they fall within this proscription. As acknowledged by the majority, all claims on appeal contain, at least in part, apparatus limitations which are internal structures of the claimed computer as configured to carry out appellant's scan conversion program. The issue, then, is whether casting program limitations in apparatus format renders *Benson* inapplicable to the claims on appeal. I believe not. Merely because the instant claims are in apparatus rather than method format does not, in my opinion, distinguish from *Benson*. Indeed, narrowly limiting *Benson* to method claims would permit and invite circumvention of that decision by the facile drafting device of claiming in apparatus form an idea for programming computers that would, according to my understanding of *Benson*, be unpatentable subject matter if claimed as a method.[3] Such results would be anomalous.

The majority relies heavily upon this court's 3–2 ruling in *In re Johnston*, 502 F.2d 765, 183 USPQ 172 (CCPA 1974), *rev'd on other grounds*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692, 189 USPQ 257 (1976), which viewed record-keeping machine systems defined by apparatus claims as being statutory subject matter under section 101. *Benson* was there distinguished by narrowly limiting it to method claims, not applicable to the apparatus type of claims then before us:

> Furthermore, the instant claims, in *apparatus* form, do not claim or encompass a law of nature, a mathematical formula,

or an algorithm. [502 F.2d at 771, 183 USPQ at 177, emphasis in original.]

Upon careful review of *Johnston*, however, I am not convinced that the distinction set forth therein between method and apparatus claims is completely sound. Certainly, the distinction between method and apparatus claims developed in *Johnston* is open to question where an applicant has merely claimed an otherwise proscribed computer program in "means for" language. Moreover, the Court in *Benson* failed to draw any distinction between claim 13 (note 1, supra), which recited a method devoid of any apparatus, and claim 8 (note 1, supra), which recited a method employing a specific piece of apparatus, holding both unpatentable under section 101. Clearly, if the apparatus used in the method of *Benson* claim 8 did not take the invention defined therein out of a general proscription against patenting programs in whatever form claimed, then similarly the apparatus format of the claims here on appeal does not make these claims, which cover programming, claims to statutory subject matter.

---

**3.** I note in passing the following material quoted by the Court in *Benson*, which is taken from the *Report of the President's Commission on the Patent System* (1966):

> Uncertainty now exists as to whether the statute permits a valid patent to be granted on programs. Direct attempts to patent programs have been rejected on the ground of

nonstatutory subject matter. Indirect attempts to obtain patents and avoid the rejection, by drafting claims as a process, or a machine or components thereof programmed in a given manner, rather than as a program itself, have confused the issue further and should not be permitted. [409 U.S. at 72, 93 S.Ct. at 257, 175 USPQ at 677.]